IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STANLEY KIEFFER,<br>            **Plaintiff,**<br><br>    v.<br><br>CPR RESTORATION & CLEANING<br>SERVICE, LLC,<br>            **Defendant.** | CIVIL ACTION<br><br><br><br>NO.  15-3048 |

## OPINION

Plaintiff Stanley Kieffer ("Kieffer") brings this action against his former employers,

Defendants CPR Restoration & Cleaning Service, LLC ("the Partnership"), and CPR

Restoration, Inc. ("the Corporation") (collectively, "Defendants"), alleging violations of the

Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"),

and the Family Medical Leave Act ("FMLA"), as well as common law retaliation.  Before the

Court is Defendants' Motion for Summary Judgment on all claims.  For the reasons outlined

herein, the motion is granted.

### I.      BACKGROUND

#### A.  Defendants' Businesses

The Partnership and the Corporation are businesses that perform emergency remediation

services for properties damaged by water, fire, smoke, mold, sewage, wind and other losses.  *See*

Joint Appendix ("JA") 1, 168, 225, 538; Defendants' Statement of Undisputed Material Facts

("Def. Facts") ¶¶ 1-2; Plaintiff's Response to Defendants' Statement of Undisputed Material

Facts ("Pl. Resp.") ¶¶ 1-2.  Both Defendants' services are performed by roving crews consisting

of laborers and their supervisor.  Def. Facts ¶ 7; Pl. Resp. ¶ 7.  Crews perform a variety of

physical labor, including: soot and smoke removal; structure and content cleaning; mold

1

mitigation; demolition; boarding up and securing properties; and drying and dehumidification. JA 117-18, 315, 538-39.

The Partnership is based in Philadelphia, Pennsylvania, and provides services almost exclusively in Philadelphia, southern New Jersey, and nearby counties.  Def. Facts ¶ 1; Pl. Resp. ¶¶ 1, n. 11, 2.  The Corporation is located in Perth Amboy, New Jersey, and provides services in northern New Jersey and New York.  Def. Facts ¶ 2; Pl. Resp. ¶ 1, n. 11; JA 133.  Defendants have different business addresses and different federal tax identification numbers.  JA 446-50.

Michael Fingerman ("Fingerman") is the owner and President of both the Corporation and the Partnership.  JA 191; Plaintiff's Statement of Disputed Material Facts ("Pl. Facts") ¶¶ 131-32; Defendants' Reply to Plaintiff's Statement of Disputed Material Facts ("Def. Resp.") ¶¶ 131-32.  Fingerman has his own office at each location and splits his time between the Corporation and the Partnership.  Pl. Facts ¶¶ 132-33; Def. Resp. ¶¶ 132-33.

Debbie Moulder ("Moulder") has worked for the Partnership as an office manager for approximately six years.  Pl. Facts. ¶ 134; Def. Resp. ¶ 134.  However, Moulder collected field scope paperwork from supervisors working out of New Jersey for a period of two to three weeks around the initial setup of the Corporation's office.  Pl. Facts ¶ 147; Def. Resp. 147; JA 298. Moulder's current responsibilities include collecting commission information from supervisors at both the Corporation and the Partnership and placing them into a spreadsheet.  Pl. Facts ¶ 148; Def. Resp. ¶ 148.

Michelle Marshall ("Marshall") has worked for the Partnership as a facilities manager for approximately six years.  Pl. Facts ¶ 149; Def. Resp. ¶ 149; JA 278.  During that time, she has been to the Corporation's office between five and ten times to assist with cleaning jobs.  *Id.*

Jennifer Limonnik ("Limonnik") has worked for the Partnership for four years and manages payroll information for both the Partnership and the Corporation.  Pl. Facts ¶ 153; Def. Resp. ¶ 153; JA 261.  This responsibility involves importing hours reported by supervisors into a payroll calculating and processing system run by ADP, which then automatically handles the payments.  JA 261-62.  Limonnik also reports workers' compensation claims from the Partnership and the Corporation to the proper carrier by opening a claim and assigning it a claim number.  JA 263-64.  Statements and insurance pertaining to the claim are then handled by the supervisor or regional manager.  *Id.*

The Partnership's written "Rules & Regulations" state that "[a]ll employees are expected to arrive on time . . . and in physical condition to work," and "[i]f you are not able to arrive on time, you are not able to work."  JA 454 (U, V(a)).

### B.  Kieffer's Employment

Kieffer was employed by the Partnership on two separate occasions; he began his first term of employment with the Partnership around January of 2003.  JA 110.  In or around September of 2008, Kieffer was terminated after an incident wherein a customer claimed that the Partnership had damaged his personal property.  JA 122, 377.  In or around August of 2010, Kieffer began another period of employment with the Partnership and was rehired as a supervisor.  JA 112, 380.  His employment agreement with the Partnership described his duties as "[a]ll duties that include mitigation of property damaged home and buildings and xactimate estimating."  JA 380.  As a supervisor with the Partnership, Kieffer reported to John Fickenscher ("Fickenscher"), the Operations Manager.  JA 54, # 2.B.

Kieffer suffers from several ailments, namely Crohn's Disease, diabetes, and chronic obstructive pulmonary disease ("COPD").[1]  JA 4.  Kieffer testified at his deposition that he was "able to work every day on a daily basis" (JA 118), but also stated that he had asked for time off several times in order to "recoup or rest" after his medical conditions were exacerbated.  JA 107.  On one occasion, Marshall told Kieffer that Fickenscher was "very concerned" about Kieffer's medical conditions.  *Id.*  Fingerman also told Kieffer "a couple times" over a four to five year period that he was concerned about Kieffer's health and that he believed it might be interfering with Kieffer's work.  *Id.*

On or about August 30, 2013, while performing his job duties as a supervisor for the Partnership, Kieffer sustained an injury to his right shoulder.  JA 417.  Kieffer described the incident on an Accident/Incident Report Form as follows: "[I] was loading debris & furniture into [a] dumpster, the dumpster was getting hard to close the door & throw debris bags over top of dumpster. [T]hat's when I hurt my shoulder." *Id.*; *see also* JA 124, 136.

Kieffer made a workers' compensation claim and was evaluated by the Partnership's workers' compensation medical provider, WorkHealth, on September 9, 2013.[2]  JA 419.

---

[1] Although the Kieffer's Complaint alleges that he has Crohn's Disease (JA 4, ¶ 16), on an 'Employee Enrollment/Change Form' for employer-issued health insurance effective May 1, 2011, Kieffer was asked to disclose whether he suffered from an "[u]lcer, colitis, gallstones or any other disorder of the stomach[.]"  Kieffer failed to disclose his purported Crohn's Disease and instead responded by checking the "No" box next to this question.  JA 398, # 2; JA 324, #2.  In addition, a December 7, 2012 document produced by Kieffer's medical provider states, "[h]e carries a diagnosis of Crohn's disease but his new gastroenterologist does not believe this to be the case."  JA 567, lines 4-5.  Although the Complaint alleges that he has diabetes (JA 4, ¶ 16), on an "Employee Enrollment/Change Form" for employer-issued health insurance effective May 1, 2011, Kieffer was asked, "[h]as any person [enrolling for insurance] been diagnosed with diabetes?"  Kieffer failed to disclose his diabetes and instead responded by checking the "No" box next to this question.  JA 398, # 11; see also JA 324 (leaving answer # 11 blank).  Although the Kieffer's Complaint alleges that he has COPD (JA 4, ¶ 16), on an "Employee Enrollment/Change Form" for employer-issued health insurance effective May 1, 2011, Kieffer was asked whether he has "any . . . disorders of the lungs or respiratory system."  Kieffer failed to disclose his purported COPD and instead responded by checking the "No" box next to this question.  JA 398, # 5; JA 324, #5 (same answer dated October 1, 2013).

[2] Also on September 9, 2013, Kieffer submitted to a drug test that later tested positive for marijuana.  JA 405.  Although the Partnership's "Rules & Regulations" prohibit the use of drugs or alcohol by employees, the company did not terminate his employment at that time.  JA 454 (U).

Kieffer's shoulder injury was determined to be a sprain.  JA 124, 353, 412.  A "Work Capacity" form generated that same day indicated that Kieffer should not lift more than five (5) pounds, drive a vehicle, or engage in "overhead activity."  JA 414.  On September 13, 2013, Kieffer visited WorkHealth again and the corresponding Work Capacity form described him as having "No Use" of his right arm.  JA 413; *see also* JA 583 (same diagnosis from Aria Health, Kieffer's health provider).  There is a dispute as to whether the Partnership contested Kieffer's workers' compensation claim, but there is no evidence of a hearing or other proceeding arising from the claim and Kieffer received benefits beginning in August 2013.  JA 129-30, 177.

Kieffer informed Fickenscher of his injury and alleges that he requested that the Partnership provide him with a driver (see JA 5, ¶ 23) but Defendants deny receiving any such request.  JA 78, at 9.A, 9.C (indicating that the Partnership received a prior request due to a 2012 hand injury).  Kieffer subsequently requested, and took, medical leave beginning in September 2013.  JA 124-25, 130, 144.  During that period his shoulder injury was treated with shots and physical therapy.  JA 125.

On or about October 18, 2013, Kieffer informed the Partnership that "the doctor has him out of work until November 12th, with a return date of November 13th."  JA 406.  On October 22, 2013, the Partnership was notified that Kieffer had failed to attend a doctor's appointment with WorkHealth the previous day.  JA 404.  When Kieffer attempted to return to work on November 4, 2013, Fickenscher told him that he was being terminated because "we have enough trouble feeding the ones we have, and things have gotten weird, so I thought long and hard, and this is just the best decision I think.  So take care of yourself."  JA 125-26.  When Kieffer contacted Fingerman about the issue, he declined to overrule Fickenscher's decision.  JA 127.

5

In November of 2013, Kieffer filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Partnership.  JA 131, 343.  There is no record evidence that the Partnership received notice of the Charge of Discrimination before January 2014 or that any response was ever filed.  JA 132, 214.

In January of 2014, Fingerman contacted Kieffer and asked if he would be interested in working for the Corporation in Perth Amboy, New Jersey, under Joseph Keller ("Keller"), the Corporation's regional manager.  JA 54, 132, 224-25.  Thereafter, Kieffer was hired by the Corporation as a supervisor and earned the same compensation as he had while working for the Partnership.  JA 13, 54, 131-33.  That same month,[3] Fingerman sent Kieffer a text message of the EEOC complaint and wrote, "what the fuck is this."  JA 131.

Kieffer continued to reside in Pennsylvania and commuted back and forth from New Jersey each day; sometimes the Corporation would pay for a room for Kieffer if he was too exhausted to commute home.  JA 133.  During a conversation with Keller and Fingerman, Kieffer was told that if he helped establish the Corporation's new office in Brooklyn within six months, he would be "relocated per the company, because going back and forth was expensive for both."  JA 134-35.[4]  It was Kieffer's understanding that the Corporation would cover the costs of a moving truck, first month's rent, last month's rent, and security deposit for a new apartment in New York.  JA 135.

During this time, Fickenscher encouraged Keller to terminate Kieffer's employment, but Keller refused to do so.  JA 134-35.  In February 2014, Kieffer came down with a very bad cold and requested time off from work; Keller refused.  JA 109.

---

[3] It is unclear which occurred first: Kieffer's hiring or the receipt of the text message.

[4] Defendants dispute that this offer was ever made.  Pl. Facts ¶ 124; Def. Resp. ¶ 124.

In or around June of 2014, Kieffer spoke with Fingerman over the phone and via text message about the moving expenses, but "he was vague and not answering . . . he started saying that he couldn't afford it." JA 137-38. Keller subsequently informed Kieffer that Fingerman was no longer willing to pay for relocation, and that "it would just be cheaper for him to hire somebody up here." *Id.* Kieffer testified at his deposition that he could not afford to continuing commuting or pay his own moving expenses, and asserts that the Corporation's refusal to pay amounted to a constructive discharge.[5] JA 7 (Complaint, ¶¶ 38-39); 138-40.

Once 180 days elapsed after Kieffer filed the EEOC Charge against the Partnership without any action by the EEOC, Kieffer obtained a right to sue letter and commenced the present lawsuit shortly thereafter.[6] *See* JA 327, 343.

## II.   STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

---

[5] On June 18, 2014, Kieffer signed a release in which he acknowledged that he had been "fully and fairly compensated for the hours and time [he] worked" and in which, after receiving one thousand five hundred dollars ($1500.00) as consideration, he "agree[d] to release CPR Restoration Inc. and all affiliates of any compensatory claims[.]" JA 344. Neither party suggests that this release has any effect on the claims currently before the Court.

[6] Kieffer and his wife currently live and work in Florida; Kieffer's new employer did not pay his relocation expenses. JA 139, 287.

*Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

The reviewing court should view the facts "in the light most favorable to the non-moving party" and draw all reasonable inferences in that party's favor.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (citing *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

### A.  Family Medical Leave Act

Defendants move for summary judgment on Count VI (FMLA) of the Amended Complaint because, they argue, neither entity is an "employer" subject to the requirements of FMLA.  To be covered by FMLA, a company must employ fifty or more employees for at least twenty work weeks in a calendar year.  *See* 29 C.F.R. § 825.104(a).  In this case, Kieffer was employed at various points by the Corporation and the Partnership, each of which employed less than fifty individuals during the relevant periods.  Def. Facts ¶¶ 53-58[7]; JA 87-88, 95-96.  To satisfy the requirement, Kieffer argues that the Corporation and the Partnership should be treated as a single employer.

To prove that multiple entities constitute a single employer subject to FMLA, Kieffer may utilize either the "joint employment test," or the "integrated employer test."  *See* 29 C.F.R. §

---

[7] Kieffer's response to these assertions of fact were "[d]enied as stated" on the grounds that Defendants "are joint/integrated employers," but did not specifically dispute the number of individuals employed by each entity.  Pl. Resp. ¶¶ 53-58.

825.104(c)(1).  The difference between the "joint employer" and the "integrated employer" tests turns on whether the Kieffer seeks to impose liability on his legal employer or another entity. *Compare* 29 C.F.R. § 825.106 *with* § 825.104(c)(2).  The former looks to whether there are sufficient indicia of an employer/employee relationship to justify imposing liability on the Kieffer's non-legal employer; the latter applies where another entity is sufficiently related to the legal employer such that its actions, or in this case its size, can be attributable to the legal employer.  *See Arculeo v. On-Site Sales & Mktg., L.L.C.,* 425 F.3d 193, 197-99 (2d Cir. 2005) (discussing differences between the tests); *Engelhardt v. S.P. Richards Co.*, 472 F.3d 1, 3-5 (1st Cir. 2006) (same).

As Kieffer uses the terms "joint/integrated" interchangeably in his filings without citing to the Code of Federal Regulations (Opp'n at 26-28), the Court will address both tests.

## 1. Integrated Employer Test

In the integrated employer context, a district court looks to whether several entities are properly seen as a single employer despite being nominally and technically distinct.  *Arculeo*, 425 F.3d 193.  In analyzing the entities' relationship, the court should consider: "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control."  *Id.*  The Third Circuit has underscored the need to examine "economic realities as opposed to corporate formalities."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486 (3d Cir. 2001) (internal citation omitted); *see also Haybarger v. Lawrence Cnty. Adult Probation and Parole*, 667 F.3d 408, 417-18 (3d Cir. 2012) ("[i]n analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, most courts look to the 'economic reality' of the employment situation").  Whether multiple entities constitute an integrated employer is not determined by the application of any

single criterion, "but rather the entire relationship is to be reviewed in its totality."  29 C.F.R. § 825.104(c)(2).

### a. *Common Management*

This factor looks to whether the two entities: "(1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 498 (internal citations omitted).  Here, Fingerman is President at both the Partnership and the Corporation and maintains an office at each location.  JA 193; Pl. Facts ¶¶ 131-32; Def. Resp. ¶¶ 131-32.  However, each Defendant has separate Office Managers and Operations Managers, neither of which can fire employees at the other entity.[8]  Pl. Statement of Facts 134-35; JA 214, 280-81, 297-99.  Aside from Fingerman, there is no other record evidence of dual occupation or "repeated[] transfer" of management personnel between Defendants.

### b. *Interrelation Between Operations*

The Partnership's business address in Philadelphia, Pennsylvania, while the Corporation's address is in Perth Amboy, New Jersey, and each entity has its own federal tax identification number.  JA 448-49.  Kieffer's primary argument in favor of interrelation is that several employees appear to work for both defendants interchangeably, namely: Limonnik, Marshall, and Moulder.  These employees manage payroll, administrative, and technical matters,

---

[8] The Court attaches no significance to Kieffer's argument regarding the superficial similarity of employment hierarchy: owner; operations manager; supervisor; laborer.  Although these are similar (*i.e.* "common") corporate titles in the lay sense, the phrase "common management" in fact refers to *shared* management between the entities. *See Pearson*, 247 F.3d at 498.

respectively, and each is based out of one location with occasional trips to the other business over several years.  Pl. Facts ¶¶ 134-53; Def. Resp. ¶¶ 134-53.

Generally, mere administrative overlap between two companies is not indicative of a single, integrated employer.  *See e.g.*, *Engelhardt*, 472 F.3d at 7-8 (shared employee benefits programs and payroll services were reflective of a need "to capitalize on certain economies of scale" rather than integration); *Papa v. Katy Indus., Inc.*, 166 F.3d 937 (7th Cir. 1999) (Posner, J.) (employers were not integrated even though one was a wholly-owned subsidiary of the other, employees participated in the same pension plan, and computer operations were integrated).

In this case, there is no record evidence to suggest that, for example, the Partnership and the Corporation ever mingled financial accounts, coordinated their cleaning and remediation services, submitted joint vendor proposals, advertised services as one entity, maintained the same business address, obtained certifications together, or shared equipment.  *Cf. Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 428-29 (6th Cir. 2014) (interrelated defendants maintained the same registered business address, jointly obtained quality certifications, and orders from one constituted half of the other's business); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933-34 (11th Cir. 1987) (interrelated defendants conducted joint advertising and had centralized checks and bill payments); *EEOC v. Dolphin Cruise Line, Inc.*, 945 F.Supp. 1550, 1553-54 (S.D. Fla. 1996) (interrelated defendants had interchangeable logos and letterheads, shared offices, and centralized check writing).

### c.   *Centralized Control of Labor Relations*

In his individual role as President at both the Corporation and the Partnership, Fingerman has made decisions regarding the retention of employees at both Defendants.  JA 196-97. However, Kieffer has offered no evidence that one *business* exerted control of the labor relations

11

of the other.  *See e.g. Grace v. USCAR*, 521 F.3d 655, 665 (6th Cir. 2008).  In *Grace*, the Court

of Appeals for the Sixth Circuit observed that "USCAR made its own decisions with regards to

securing an additional employee to replace [the plaintiff]," and there was no evidence that

"Bartech exercised any control over [USCAR's] employment decision," or vice versa.  *Id.*

 Here, although Fingerman undertook similar responsibilities at both Defendants,

deposition testimony by supervisors and administrative personnel at each business indicates that

labor decisions were made independent of the other.  JA 169-70, 263, 280-81, 312.   At his own

deposition, Kieffer recalled that Fingerman declined to overrule Fickenscher's decision to

terminate him, telling Kieffer, "If [Fickenscher] made the decision to let me go, then

[Fingerman] has to stand by it."  JA 127; *see also Grace*, 521 F.3d at 665 ("the mere fact that

two entities both communicated with a single employee does not mean that their employment

relations, *as a whole*, are interrelated") (emphasis in original).

### d.  *Degree of Common Ownership/Financial Control*

 Although Fingerman owns both the Partnership and the Corporation, common ownership,

on its own, is insufficient to establish that two entities constitute a single employer.  JA 191; Pl.

Statement of Facts 131-32.  *See Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1257 (11th

Cir. 2004) ("As a matter of law, we do not believe that common ownership of two corporations

is enough for a jury to conclude that they were integrated into one operation for FMLA

purposes"); *Davis v. Ricketts*, 765 F.3d 823, 829 (8th Cir. 2014) (applying the factors in a Title

VII context, "the fact that Ricketts controls two distinct corporations does not make them

integrated").

### *e.  Conclusion*

Whether Defendants constitute an integrated employer "is not determined by the application of any single criterion, but rather the entire relationship is to be reviewed in its totality."  29 C.F.R. § 825.104(c)(2).  Here, the only evidence of common management or ownership is a single individual – Fingerman – holding the office of President at both the Corporation and the Partnership.  The only evidence of interrelation between operations is merely administrative.  There is no evidence of centralized control of labor relations or financial control.  Based on the evidence offered by Kieffer, the "economic reality" indicates that Defendants do not constitute an integrated employer under the FMLA.  *See Pearson*, 247 F.3d at 486;  *Haybarger*, 667 F.3d at 417-18.

### 2.  **Joint Employment Test**

In a joint employer relationship there is no single integrated enterprise; rather, "two or more businesses exercise some control over the work or working conditions of the employee." *See* 29 C.F.R. § 825.106(a); *Arculeo*, 425 F.3d at 198 (citing *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132 (2d Cir. 1985)).  Unlike integrated employers, which are treated as a single legal entity, joint employers "may be separate and distinct entities with separate owners, managers, and facilities."  29 C.F.R. § 825.106(a).  The following scenarios are generally recognized as joint employment relationships:

(1) Where there is an arrangement between employers to share an employee's service or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

13

29 C.F.R. § 825.106(a)(1)-(3).   By way of example, the Code of Federal Regulations cites temporary placement agencies and the businesses to which they supply employees as quintessential joint employers.   *See* 29 C.F.R. § 825.106(b)(1).

Although Kieffer argues that defendants are "joint/integrated employers" (Opp'n at 26), the factors he cites are specific to the integrated employer test.   Kieffer has not offered evidence that the Corporation and the Partnership exercised simultaneous control over his working conditions or agreed to share his services, or that either Defendant ever acted in the interest of the other in relation to Kieffer's employment.   In fact, the scant evidence available in the record indicates just the  opposite: for example, when Fickenscher (the Partnership) encouraged Keller (the Corporation) to fire Kieffer, Keller declined to do so.   JA 134-35.   Accordingly, the Corporation and the Partnership cannot be considered a single employer under the joint employment test or the integrated employer test, and the FMLA claims must be dismissed.

### B.  ADA and PHRA

Kieffer's ADA and PHRA claims arise from the circumstances surrounding: (1) his shoulder injury in 2013; (2) his EEOC complaint against the Partnership in 2013; (3) the Corporation's refusal to grant him time off for treatment of chronic conditions in 2014; and (4) the Corporation's refusal to pay moving expenses.   Kieffer claims that he suffered disability discrimination, a hostile work environment, failure to accommodate, and retaliation.   Defendants move for summary judgment on the grounds that Kieffer has failed to establish that he was a "qualified individual" under the ADA and there is no record evidence to support his remaining claims.   Mtn. at 8, 20, 24.

"The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose

of both ADA and PHRA claims on the same grounds." *Bialko v. Quaker Oats Co.*, 434 Fed.

Appx. 139, 142 (3d Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 382 (3d Cir.

2002)); *see also Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (holding that

the ADA and the PHRA are "to be interpreted consistently," and that both "have the same

standard for determination of liability").  Thus, the Court considers the ADA and PHRA claims

together.

### 1.  Counts I-IV: Shoulder Injury

#### a.  *Disability Discrimination*

A plaintiff presents a prima facie case of disability discrimination under the ADA and the

PHRA by demonstrating that: (1) he is a disabled person within the meaning of the ADA[9]; (2) he

is otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) he has suffered an otherwise adverse employment

decision as a result of discrimination.  *See Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir. 1996);

*Macfarlan*, 675 F.3d at 274.  Defendants do not contest that Kieffer is a disabled person or that

he suffered an adverse employment action; rather, they argue that Kieffer was not "otherwise

qualified" because he was unable to perform the essential functions of the position after his

shoulder injury rendered him incapable of performing physical labor.  Mtn. at 8.  In response,

Kieffer argues that there is a genuine dispute of material fact regarding the essential functions of

his position, thereby precluding summary judgment.

---

[9] Although courts have traditionally evaluated whether a plaintiff has established a "disability" under the ADA and PHRA coextensively, *see Kelly v. Drexel Univ*., 94 F.3d 102, 105 (3d Cir. 1996), Congress substantially modified the ADA in 2008 via the ADA Amendments Act ("ADAAA").  While the ADAAA lowered the standard for finding a disability under the ADA, the PHRA has not been similarly amended.  *See Szarawara v. Cnty. of Montgomery*, No. 12-5714, 2013 WL 3230691, *2 (E.D. Pa. June 27, 2013) ("[T]he PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims.").  As discussed *infra*, because this element is uncontested, the different standards do not alter the Court's analysis.

A two-part test is used to determine whether someone is "otherwise qualified" for the job. First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, *etc*." *Gaul v. Lucent Techs. Inc.,* 134 F.3d 576, 580 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, App. at 353). Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and the burden is on the employee to prove that he is an "otherwise qualified" individual. *Id.* (citing *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir. 1996)); *Shiring*, 90 F.3d at 832 (citing *Buckingham v. United States,* 998 F.2d 735, 739-40 (9th Cir.1993)).

Consideration must be given to the employer's judgment as to what functions of a job are essential; for example, the written description of the job prior to advertising or interviewing applicants "shall be considered evidence of the essential functions of the job." 42 U.S.C. 12111(8). Defendants, citing an expired Craigslist[10] ad for a "Fire and Water Damage Supervisor" position at the Partnership, allege that the essential functions of Kieffer's position included soot and smoke removal, structure and content cleaning, mold mitigation, demolition, boarding up and securing properties, and drying and dehumidification. Mtn. at 9; JA 538-39. Moreover, an employment agreement signed by Kieffer indicates that his position required "Fire/Water/Smoke/Mold Remediation. *All* duties that include mitigation of property damaged home and buildings and xactimate [sic] estimating." JA 315 (emphasis added), 117-18.

---

[10] Craigslist is an online collection of local classifieds and forums that advertise "jobs, housing, goods, services," and the like. Craigslist, *Factsheet*, www.craigslist.org/about/factsheet (last visited July 7, 2016).

Although Kieffer now claims that the physical aspects of his job were voluntary (Opp'n at 6), during his deposition he conceded that physical labor, as he understood it, was "part and parcel" of his employment, and further testified that he physically assisted the crews that he supervised "most of the time."  JA 113; s*ee also* 29 C.F.R. § 1630 app. § 1630.2(n) (2007) ("The time spent performing the particular function may also be an indicator of whether that function is essential").  In claiming that a factual dispute precludes summary judgment, the non-moving party "may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute."  *Doe*, 480 F.3d at 256 (citing *Celotex Corp.*, 477 U.S. at 322-26).  In light of Kieffer's own testimony and the evidence presented by Defendants, there can be no *genuine* dispute that physical labor was an essential function of Kieffer's position.  Thus, the burden is on Kieffer to demonstrate that he would have been "otherwise qualified" for the position, with or without a reasonable accommodation.  *Gaul*, 134 F.3d at 580.

In Kieffer's Amended Complaint, he alleges that he "requested that he be given a driver" because his shoulder injury prevented him from being able to drive a vehicle.  *Id.* at ¶ 23.  He further alleges that his request for a driver was a reasonable accommodation and that, without it, he was unable to return to work.  *Id.* at ¶¶ 23-24, 43-46.  As Kieffer was unable to perform physical labor as a result of his shoulder injury (JA 353, 413), he would not have been able to perform the essential – *i.e.*, physical – functions of the job even if his request for a driver had been granted.

In the alternative, Kieffer now argues that a temporary leave of absence would have been a reasonable accommodation for his shoulder injury.  Opp'n at 4-6.  The Partnership's written "Rules & Regulations" state that "[a]ll employees are expected to arrive on time . . . and in

physical condition to work," and "[i]f you are not able to arrive on time, you are not able to

work."  JA 454 (U, V(a)).  The Third Circuit has never explicitly recognized that a leave of

absence could be a reasonable accommodation,[11] and it is not among the enumerated examples

identified by the ADA itself.  *See Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 Fed. Appx. 727,

729 (3d Cir. 2009) ("Attendance can constitute an essential function under the ADA . . .

Although we have not directly ruled on the issue") (citing *Jovanovic v. In-Sink-Erator Div. of

Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular

attendance is usually an essential in most every employment setting; if one is not present, he is

usually unable to perform his job")); 42 U.S.C.A. § 12111(9)(B) (listing examples of reasonable

accommodation).

     In any event, the only allegations are that Kieffer requested leave and that request was

granted.  Amended Complaint ¶ 27.  There is no record evidence that Kieffer ever informed

Defendants that medical leave would have been a reasonable accommodation.  *See Walton*, 168

F.3d at 670 (the plaintiff bears "the burden of identifying an accommodation"); *Conneen v.

MBNA America Bank, N.A.*, 334 F.3d 318, 332-33 (3d Cir. 2003) ("the employee 'must make

clear that [he/she] wants assistance for his or her disability' . . . both the employer and the

employee have a duty to act in good faith once the interactive process begins") (internal citations

omitted).  Even if medical leave would have been a reasonable accommodation, "[t]here is no

evidence that permits any conclusion other than that the requested leave was for an indefinite and

open-ended period of time," even if, in retrospect, it lasted only two months.  *Fogleman v.*

---

[11] Several courts have expressed doubt that leave can ever constitute a reasonable accommodation. *See e.g.*, *Byrne v. Avon Products*, 328 F.3d 379, 380-81 (7th Cir. 2003) ("Not working is not a means to perform the job's essential functions"); *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994) ("coming to work regularly" is an essential function of regular employment); *Tyndall v. Nat. Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (unless an employee can work from home, "an employee 'who does not come to work cannot perform *any* of his job functions, essential or otherwise") (internal citation omitted) (emphasis in original).

*Greater Hazleton Health All.*, 122 Fed. Appx. 581, 586 (3d Cir. 2004); *see also* JA 181

(Fickenscher Dep. at p. 73:13-20) ("I assumed that he was injured and was never going to come

back . . ."). By Kieffer's own admission, he did not inform Fickenscher of his expected return

date until late October 2013, approximately eight weeks after his injury. JA 180, 679; Opp'n at

15. Indefinite leave is not recognized as a reasonable accommodation. *Id.* (citing *Rascon v. U.S.*

*West Communications, Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998)); *cf. Criado v. IBM Corp.*, 145

F.3d 437, 444 (1st Cir. 1998) (temporary leave was a reasonable accommodation where the

plaintiff's physician was "optimistic that the leave would ameliorate her disability," there was

evidence that the leave was only temporary, and the employer already offered employees paid

disability leave).

     Because Kieffer would not have been able to perform the essential duties of his position

with or without accommodation, Kieffer was not a qualified individual during this period.

Accordingly, the disability discrimination claims arising from his 2013 injury must be dismissed.

*See Macfarlan*, 675 F.3d at 274.

     **b.   *Hostile Work Environment***

     A claim for a hostile work environment based on disability, "like one under Title VII,

would require a showing that: (1) [the plaintiff] is a qualified individual with a disability under

the ADA; (2) []he was subject to unwelcome harassment; (3) the harassment was based on [his]

disability or a request for an accommodation; (4) the harassment was sufficiently severe or

pervasive to alter the conditions of [his] employment and to create an abusive working

environment; and (5) that [the employer] knew or should have known of the harassment and

failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n. of Se.*

*Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999); *see also Stough v. Conductive Techs., Inc.*, 613

Fed. Appx. 145, 149 (3d Cir. 2015).  Because Kieffer was not a "qualified individual with a disability" during this period, this claim must be dismissed.

### c.  *Failure to Accommodate*

 A failure to accommodate claim requires: (1) the employer had adequate notice of the employee's disability; (2) the employee requested an accommodation; (3) the employer failed to make a good faith effort to assist the employee; and (4) the employee "could have been reasonably accommodated but for the employer's lack of good faith."  *Armstrong v. Burdette Tomlin Memorial Hosp.*, 438 F.3d 240, 246-47 (3d Cir. 2006).  As discussed *supra*, Kieffer has not demonstrated that he could have been reasonably accommodated; therefore, this claim must be dismissed.

### d.  *Retaliation*

However, "a plaintiff in an ADA *retaliation* case need not establish that he is a 'qualified individual with a disability.'"  *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) (emphasis in original).  To establish a prima facie case of retaliation, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Id.* at 500.  ADA retaliation claims are analyzed under the same burden-shifting framework employed by Title VII.  *See EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015) ("The antiretaliation provisions 'are nearly identical,' and 'precedent interpreting any one of these statutes is equally relevant to the interpretation of the others'") (quoting *Fogleman*, 283 F.3d at 567).

Kieffer satisfies the first two elements: a good faith request for reasonable accommodation is a protected activity (*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183,

191 (3d Cir. 2003)), and Kieffer alleges that he was terminated in November 2013 – an adverse

employment action.  With respect to the third element, however, Kieffer has not offered any

direct evidence of a causal connection between the request for accommodation and the alleged

adverse action.  JA 126.  Rather, Kieffer relies on the temporal proximity of events to establish

the requisite connection.  Opp'n at 21-22.

Unless the timing of events is unusually suggestive of a retaliatory animus, "temporal

proximity alone will be insufficient to establish the necessary causal connection . . . ."  *Farrell v.*

*Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).  After all, "[i]t is causation, not

temporal proximity itself, that is an element of plaintiff's prima facie case. . . ."  *Kachmar v.*

*SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).  Without more, the two month lapse

between Kieffer's request and his termination is insufficient to demonstrate a causal connection

under the ADA or the PHRA.  *See Williams v. Philadelphia Housing Authority Police Dept.*, 380

F.3d 751, 759-60 (3d Cir. 2004) (two month lapse between request for accommodation and

discharge was not, on its own, unusually suggestive of retaliatory motive); *cf. Jalil v. Avdel*

*Corp.*, 873 F.2d 701 (3d Cir. 1989) (temporal proximity established causation where the plaintiff

was discharged only two days after the defendant received notice of his EEOC claim).

Where the time between the protected activity and adverse action is not so close as to be

unusually suggestive of a causal connection, courts may look to the intervening period for

"demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . or

other types of circumstantial evidence."  *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302

(3d Cir. 2007), *as amended* (Aug. 28, 2007) (citing *Robinson v. City of Pittsburgh*, 120 F.3d

1286, 1302 (3d Cir. 1997)).  Although asked several times during his deposition about such

evidence, Kieffer could offer only two instances of supposed animus: (1) one manager stated that

21

Fickenscher was "concerned" about Kieffer's medical conditions; and (2) Fingerman allegedly expressed "concern[]" that Kieffer's conditions were interfering with is work.  JA 107.  Kieffer did not provide any other context for the statements – *i.e.* when they occurred, whether they came after he had requested time off, been hospitalized, or missed work, *etc.* – only that similar statements were made "[s]everal times" over a four to five year period.  *Id.* at 107-08.  As recounted by Kieffer, such statements regarding his performance, standing alone, cannot reasonably be categorized as animus.  Rather, they seem to be inquiries into Kieffer's ability to comply with the Rules & Regulations and physical requirements that all other employees were subject to as well.  *See* EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act*, at VII (7.7), (1992), *available at* https://askjan.org/links/ADAtam1.html ("An employer can hold employees with disabilities to the same standards of production/performance as other similarly situated employees without disabilities for performing essential job functions (with or without reasonable accommodation)").

Having failed to demonstrate evidence of causation, the ADA and PHRA retaliation claims relating to Kieffer's 2013 shoulder injury must be dismissed.

## 2.  Counts VII-X: January 2014 through Termination

Kieffer also alleges ADA and PHRA violations arising from his requests to take time off from work to attend doctor appointments and receive medical care between January and June 2014.  Defendants move for summary judgment on the grounds that Kieffer has failed to offer evidence supporting these claims.

At the outset, when asked to identify specific instances in which he was denied time off for medical reasons in 2014, Kieffer offered only one example, from February 2014:

> Q:     Dealing in 2014 when you were in the New York/New
>         Jersey area . . . do you have a specific recollection of a

22

> Q:      period of time where you requested time off and it was not
>          permitted?
>
> A:      I can remember specifically one time I had gotten sick in
>          February.
>
>          . . .
>
> Q:      What do you recall about that?
>
> A:      I had gotten a very bad cold, and I had had it for almost a
>          week. I kept complaining to him that I needed some time
>          off to get some medicine, and [Keller] kept telling me . . .
>          to stop being a fucking pussy.

JA 109.   The common cold is precisely the kind of "transitory and minor" impairment that is not

considered a disability under the ADA.   *See* 29 C.F.R. § 1630.2(g)(1)(3); *Cohen v. CHLN, Inc.*,

Civ. A. No. 10-514, 2011 WL 2713737 at *8 (E.D. Pa. July 13, 2011) ("severe, ongoing

impairment stands in distinct contrast to those [conditions] cited by the EEOC as merely minor

and temporary, such as the common cold or flu"); *see also Lewis v. Florida Default Law Group*,

2011 WL 4527456, at *6-7 (M.D. Fla. Sept. 16, 2011) ("ordinary flu" is not "regarded as" a

disability because it is transitory and minor).   Kieffer was unable to identify any other incident

during the relevant time period in which he requested time off for other medical issues (*i.e.*

diabetes, Crohn's disease, COPD), and was denied:

> Q:      Between February 2014 and your departure of CPR in June
>          of 2014, was there any other situation, other than this cold,
>          where you said, look, I need some time off and somebody
>          said, no, you can't have it?
>
> A:      Not really, because that – I never got – it took so long to
>          get over that particular time that I was sick –
>
> Q:      Uh-huh.
>
> A:      – that I was continually asking for time off. I was tired. I
>          was worn out. I was sick.

JA. 109.  Without record evidence of discrimination based on a disability covered by the ADA, a

request for reasonable accommodations, or harassment based on an ADA disability or

accommodation request from January 2014 to his termination, the claims based on his requests

for medical leave during this time period must fail. *See discussion supra* at III.A.1; *Shiring*, 90

F.3d at 831 (discussing disability discrimination); *Macfarlan*, 675 F.3d at 274 (same); *Walton*,

168 F.3d at 667 (discussing hostile work environment); *Armstrong*; 438 F.3d at 246-47

(discussing failure to accommodate).

Kieffer's retaliation claim arising from the January – June 2014 period, however, need

not be based on an actual or perceived disability.  To establish a prima facie case of retaliation,

Kieffer must show: "(1) protected employee activity; (2) adverse action by the employer either

after or contemporaneous with the employee's protected activity; and (3) a causal connection

between the employee's protected activity and the employer's adverse action." *Krouse*, 126 F.3d

at 500.  Kieffer filed his complaint against the Partnership with the EEOC in November of 2013,

a protected activity.  JA 131; *Shellenberger*, 318 F.3d at 187.  Around May of 2014, Kieffer was

informed that Fingerman was "no longer willing to pay for the relocation, [and] that it would just

be cheaper" to hire someone else rather than pay for Kieffer's move.  JA 137.  The promise and

subsequent refusal to pay moving expenses constituted an adverse action that could have

"dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (internal quotation

omitted).  Therefore, Kieffer has offered evidence that he both engaged in a protected activity

and suffered an adverse employment action.

With respect to the third element, causation, the record evidence falls short.  As an initial

matter, the Corporation and the Partnership are not a single employer, so demonstrating

causation between the filing of a complaint against one and an alleged retaliatory action taken by

the other is problematic.  As circumstantial evidence of a causal connection, Kieffer argues: (1)

Fingerman sent him a text message with the picture of the complaint asking "what the fuck is

24

this;" (2) his requests for time off from work for medical reasons during that period were denied; (3) Fingerman began ignoring Kieffer's phone calls; and (4) the timing of the EEOC complaint and his resignation is "highly suggestive" of retaliatory motive.  Opp'n at 21-22.

Kieffer's own testimony belies these arguments.  Kieffer's brief argues, without citation to the record evidence, that Fingerman ignored his phone calls (Opp'n at 21-22), even though Kieffer testified that he "contacted [Fingerman] about the monetary issues, and he . . . started saying that he couldn't afford it."  JA 137.  Kieffer also followed up on these conversation by exchanging text messages with Fingerman "back and forth a lot."  JA 138.  Kieffer's brief also argues that his requests for time off from work were denied (Opp'n at 21-22) even though, as discussed *supra*, Kieffer could only identify one instance during the January – June 2014 time period in which he was denied time off for medical reasons, due to the common cold.  JA 109. Thus, Kieffer's only evidence is with Fingerman's text message in January 2014 regarding the EEOC complaint and the supposed temporal proximity of events.

In some limited circumstances, an "unusually suggestive" proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection.  *Marra*, 497 F.3d at 302 (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)).  In analyzing the relevant time period, the Third Circuit has observed that "[t]here is clearly a difference between two days and nineteen months," *Farrell*, 206 F.3d at 279, n. 5, although it must be taken "in its full context."  *Motto v. Wal-Mart Stores East, LP*, 563 Fed. Appx. 160, 163 (3d Cir. 2014) (holding that an 11-day period between the protected activity and adverse action was not unusually suggestive of retaliation).

In this case, approximately eight months passed from the filing of the EEOC complaint until the rescission of the offer to pay moving expenses – far too long a period to be considered

"unusually suggestive" of a retaliatory motive on its own. *See e.g.*, *Flory v. Pinnacle Health Hosp.*, 346 Fed. Appx. 872, 878 (3d Cir. 2009) (a time period "of mere months" between the protected activity and the adverse action is, on its own, "insufficient to raise an inference of causation"); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("a gap of three months . . . without more, cannot create an inference of causation"); *Motto*, 563 Fed. Appx. at 163 (11-day period was not unusually suggestive).

Where the timing is not so close as to be unusually suggestive of a causal connection, "courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees," that would give rise to an inference of causation when considered as a whole. *Marra*, 497 F.3d at 302. At some point in January 2014, Fingerman sent Kieffer a picture of the complaint via a text message and said "what the fuck is this?" JA 134. After that message, Kieffer continued to work for the Corporation for at least another four months without incident, during which time the Corporation would occasionally pay for a room for Kieffer when he was too exhausted from commuting back and forth from Pennsylvania and New York. JA 133. Kieffer has not offered any other circumstantial evidence "that [would] give rise to an inference of causation when considered as a whole" (*Marra*, 497 F.3d at 302), and instead invites the Court to speculate and assume facts not supported by the record evidence.[12] Opp'n at 15-16.

---

[12] Kieffer poses several hypothetical question without citation to the record, and repeatedly expresses doubt about witness credibility, even though credibility is not a consideration in deciding a motion for summary judgment. *See Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991) ("[c]redibility determinations that underlie findings of fact are . . . inappropriate to the legal conclusions necessary to a ruling on summary judgment").

Having failed to offer evidence establishing the element of causation, Kieffer has not met his prima facie burden and the retaliation claim arising from his EEOC complaint must be dismissed.

### C.  Workers' Compensation Retaliation

Defendants argue that Kieffer's workers' compensation retaliation claim, alleging that Kieffer was terminated because he sought workers' compensation benefits in 2013, must be dismissed as a matter of law because the Partnership assisted Kieffer in obtaining those benefits. Mtn. at 26.  Kieffer contends that the Partnership opposed his request for workers' compensation benefits, citing animus and the temporal proximity of events.  Opp'n at 17-21.

Pennsylvania's Workers' Compensation Act ("WCA"), 77 Pa. Stat. Ann. §§ 1 *et seq.*, prohibits an employer from discharging an at-will employee in retaliation for filing a workers' compensation claim.  *See Shick v. Shirey Lumber*, 716 A.2d 1231, 1237-38 (Pa. 1998).  Although the Pennsylvania courts have yet to enumerate the elements of this cause of action, federal district courts have analogized it to a retaliatory discharge claim under Title VII.  *See e.g.*, *Spring v. Sealed Air Corp.*, 483 Fed. Appx. 765, 768 (3d Cir. 2012) (citing *Landmesser v. United Air Lines, Inc.,* 102 F.Supp.2d 273, 277-78 (E.D. Pa. 2000)); *see also Stoutmire v. General Elec. Co.*, No. 2001-925, 2004 WL 3141333 (Pa. Com. Pl. Sept. 21, 2004).  Thus, to state a cause of action for workers compensation retaliation, an employee must establish that: (1) he engaged in protected activity; (2) he suffered an adverse employment action either after or contemporaneous with the protected activity; and (3) a causal connection exists between his protected activity and the employer's adverse action.  *See Shellenberger*, 318 F.3d at 187.  Kieffer has established that he engaged in a protected activity and that he suffered an adverse employment action; as with his other claims, however, the evidence of causation falls short.

27

A plaintiff may present a triable issue of causation by relying on temporal proximity or other circumstantial evidence concerning the employer's motivation.  *See Theriault v. Dollar General*, 336 Fed. Appx. 172, 174-75 (3d Cir. 2009) (citing *Marra*, 497 F.3d at 302).  Although supervisors at the Partnership may have had misgivings as to the authenticity of Kieffer's workers' compensation claim (JA 130, 177), there is no evidence that the company opposed or otherwise impeded his pursuit of benefits.  JA 129-30.  As discussed *supra*, Kieffer has not offered any evidence – circumstantial or otherwise – of animus or retaliatory motive in that intervening period.  This case is similar to *Theriault*, where the Third Circuit held that the plaintiff failed to establish causation for her workers' compensation retaliation claim "because she was terminated several months after her alleged protected activity," and did not present "any evidence of a pattern of intervening animus" or other circumstantial evidence concerning the employer's motivation.  *Id.* at 175; *see also LeBoon v. Lancaster Jewish Comm. Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule . . . a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); *cf. Villard v. Whitemark Continuing Care Ret. Cmty.*, No. Civ. A. 10-7230, 2012 WL 6562767, at *4 (E.D. Pa. Dec. 17, 2012) (finding causality where the plaintiff was fired a few months after her protected activity for alleged rude behavior *and* where the employer had given more lenient treatment to other employees and there was evidence of positive performance reviews).

As in *Theriault*, Kieffer has failed to establish the requisite causation element and his workers' compensation retaliation claim must be dismissed.

**D.  Punitive Damages**

Having dismissed all of Kieffer's claims, the Court need not address his demand for punitive damages.

**Dated:**          **August 2, 2016**

                                        **BY THE COURT:**


                                        **/S/WENDY BEETLESTONE, J.**


                                        _____
                                        **WENDY BEETLESTONE, J.**